IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 11, 2005

## MICHAEL D. McDADE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Wilson County**
**No. 01-1822     J. O. Bond, Judge**

_____

**No. M2004-02493-CCA-R3-PC - Filed June 16, 2005**

_____

The petitioner, Michael D. McDade, appeals the denial of his petition for post-conviction relief, arguing that his guilty plea was unknowing and involuntary and he was denied the effective assistance of trial counsel. Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Comer L. Donnell, District Public Defender; and Richard J. Brodhead, Assistant Public Defender, for the appellant, Michael D. McDade.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Robert N. Hibbett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On December 11, 2001, the petitioner was charged by the Wilson County Grand Jury with aggravated kidnapping, aggravated burglary, attempted rape, and simple possession of a Schedule VI controlled substance, marijuana. In accordance with a negotiated plea agreement, on January 29, 2003, the petitioner pled guilty to aggravated kidnapping, a Class B felony, in exchange for an eight-year sentence as a violent offender, as well as the State agreeing to *nolle prosequi* the remaining three counts. The facts underlying the multi-count indictment were recited by the State at the petitioner's guilty plea hearing:

[O]n December 4, 2001, [the victim] was in her home in Wilson County, Tennessee. She would testify that [the petitioner] had done some work for her previously. During that time on December 4, the petitioner came into her home, grabbed her and took her out the door. [The victim] having reasonable belief at the time that he did that to rape her. When he got out in the yard, [the victim] finally struggled and freed herself from [the petitioner]. [The petitioner] then got into a vehicle and took off. During the course of events [the petitioner] hit a mailbox. Some of the proof would show that the paint taken from [the petitioner's] vehicle is consistent with the paint on the mailbox, and that some glass that was taken from his boot when he was captured is consistent with some broken glass at the scene.

Thereafter, the petitioner filed a *pro se* petition for post-conviction relief on December 18, 2003, alleging ineffective assistance of counsel and that his guilty plea was involuntary. Post-conviction counsel was appointed and, on February 11, 2004, filed a notice, signed by the petitioner, that "there is no need to amend the original petition." Among other things, the petitioner asserted in his petition that trial counsel failed to properly consult with him, failed to investigate the evidence and potential witnesses, including a failure to conduct a "canvas of the surrounding neighborhood and vicinity of the victim's residence in order to learn if there might be any other witnesses," failed to investigate or take photographs of the crime scene, failed to "[p]roperly and timely file an appeal on the sufficiency of the evidence in which to support a conviction for the aggravated kidnapping," and "was late for court or either did not show up for a scheduled court proceeding on at least three . . . occasions." In addition, the petitioner asserted that trial counsel failed to advise him of the amount of time he was facing if he pled guilty, failed to "[a]dequately explain the applicable laws and or the ramifications of a plea agreement," and failed to "[a]ct in good faith when employing coercion as a means to gain a plea agreement, that otherwise would not have been obtained."

Trial counsel testified at the evidentiary hearing held on September 29, 2004, that she had practiced law in Tennessee since 1994 and had handled criminal cases for approximately seven years. The petitioner retained her after he dismissed his original trial counsel, with whom "he was dissatisfied." In addition to representing the petitioner as to the indictments pending in Wilson County, she also represented him in a contemporaneous criminal matter in Davidson County.[1] Trial counsel met with the petitioner "several times," both before and after she was retained, and during those meetings, she gave him "information about the law" and "possible sentencing." After being retained, she obtained a copy of discovery and reviewed it with the petitioner. The petitioner's wife called trial counsel "on a fairly regular basis," and counsel took "a lot of time out of [her] day to answer her questions." There were a number of continuances in the case, many of which were caused by "problems with having [the petitioner] transported" once he "was picked up in Davidson County on another aggravated burglary charge." Trial counsel discussed each piece of evidence with the petitioner, as well as possible defenses and potential sentences, including the fact that the

---

[1] According to trial counsel, the petitioner was charged with aggravated burglary in Davidson County; however, in his post-conviction petition, the petitioner indicates he was convicted of burglary and received a three-year sentence to be served consecutively to the sentence he now collaterally attacks.

petitioner was a "Range Two offender" and that if he was found guilty at trial, "enhanced sentencing would apply to him." She also advised the petitioner of the possibility of negotiating a Range I sentence, "which was what happened." During the course of defending the petitioner on the Davidson County charge, the petitioner told her that "he was hearing voices." Therefore, she sought mental competency evaluations in Davidson and Wilson Counties, which showed the petitioner was "competent" and "not insane." Trial counsel had no problem "whatsoever" in communicating with the petitioner concerning the plea agreement, and he never gave any indication that he did not understand its terms. The petitioner seemed "very, very smart," "articulate," and "probably up there with one of [trial counsel's] smarter clients," and there was no indication that he was under the influence of medication at the guilty plea hearing. Trial counsel explained to him that the eight-year sentence accompanying the guilty plea was a 100% sentence, but that it might be "possible" to get a "fifteen percent reduction but that is in no way guaranteed." She felt that "under the circumstances" she was able to obtain a "good deal" for the petitioner, and the first time she became aware that the petitioner was dissatisfied with her performance was when she received a copy of the petition in the mail.

The petitioner testified that trial counsel "didn't do any investigation" and did not "perform her job as an attorney" even though he paid her "$6,700 to do a job." Trial counsel had "maybe" two or three discussions with the petitioner in which she tried to persuade him to plead and accept an eight-year sentence "instead of forty something years for a charge." The petitioner said he "wanted to tell the truth," but she dissuaded him because it would "incriminate" him. The petitioner then told his version of the underlying events that led to his indictments:

> She didn't explain to me that if you go to a jury trial and it has an interconnecting criminal charge of kidnapping in which was something like this particular crime which I explained to her, it wasn't kidnapping, and it wasn't -- it may have seemed like a consequential kidnapping but it wasn't a kidnapping and I wanted to explain to her and I told her many times that I wanted to tell the truth, but she said, no, it would incriminate me. I'm saying why should it incriminate me if it's the truth being told. So, I had to do my own research on my own in which the evidence comes up to insufficient evidence of an aggravated kidnapping, pursuing an abduction for purpose of facilitating escape, because that's exactly what had happened. It wasn't no [sic] vehicle that scared me or anything like that. At the time of the incident, yes, things were going through my mind and it wasn't nothing of rape or anything like that, or anything sexual or anything like that. It was a mission for suicide attempt on my life, I wanted this person to take my life. It wasn't nothing about me going to rape anybody, and me doing any harm to anybody. It was . . . the things that was going through my mind, listening to voices and so forth, and I was on alcohol beverages and so forth, and the person I was going through - - I'm not trying to get off the subject but I wanted to speak it out so I can speak the truth, to let it be known, that's all I'm saying. That -- when the incident happened, in which I told her that it was wrong for me to go to the person's house, and to . . . destroy a person's property, but for when someone tells you that, they went into your house and grabbed

-3-

your hair, or did this, you know, it was through a doorway, at a doorway. I didn't go into the house, it was at a doorway. And when she went down like this at the doorway, there was a voice that said, grab her hair because I was afraid, I was ashamed of what I did and I grabbed her hair so she couldn't see my face, which was wrong but I was scared. And when I grabbed -- pulled her by her hair -- when I pulled her by the hair I walked down, pulled her down a few steps and then a few steps from the steps I took off. And that's the only thing that happened. I explained to her the situation, but she never looked into doing any research on such act. So I done my own research on my act and it shows in the court proceedings about what the kidnapping was an aggravated kidnapping, was a false imprisonment. And what she never brought to my attention was that sexual battery was attempted -- was a rape charge. And in which there was no intention or anything. There was no felonious attempt on any of that act of what they charged me with, sir.

. . . .

. . . [T]here wasn't nothing sexual between us. . . . Yeah, I called [the victim] on the phone because the day that I done work for her and she was telling me about her husband. We ate, she had dinner, she cooked me dinner. She heat [sic] up some food for me, she gave me two beers and she was telling me her problems. She was telling me how her husband abused her, her and the kids. She was telling me that once you join our softball team and so forth, and I'm like, I just met her and we're working, I'm doing work for her and the way she was carrying herself like we knew each other for a long time, because that's how it was, our conversation. So, she was telling me how her husband abused her and she was single and how her husband abused her kids, and I felt sorry for her about the things she was saying that he was doing to her. And at the time in which I told [trial counsel] the same thing.

. . . .

. . . It was to facilitate an escape. I was trying to get away from her so she couldn't see my face. That's all I was doing. It may have sounded like a consequence of kidnap, but it was nothing of it -- it was just to facilitate an escape. Ensuing an induction to facilitate an escape. And that's all that it was. It may have looked like it and it was no felonious to take anyone no where. No where. I had my truck. I didn't have no weapons on her. I didn't tie her up or tape her or handcuff or anything like that. Her house is right here, my truck is way down here. So it's no way that I was taking her to my truck. It was just that I wanted to -- when the incident happened I seen my truck and took to my truck so she couldn't go back and make a phone call. That's all it was.

. . . .

-4-

Okay. When the incident happened she was in the doorway. I grabbed her out the doorway. Out the doorway. She did like this, down to her knees. And since she did this down to her knees, she didn't see me. She couldn't see my face. She couldn't see my face because her head was down like this and her hands was [sic] like this. And the first thing that come in my mind, the voice said, grab her hair so she couldn't see your face. So I grabbed her hair, pulled her out the door. I didn't drag her out the doorway, I pulled her out the doorway from her hair. Her tender part of her head, grabbed her hair and pulled her several feet from her doorway. I didn't drag her off the steps, I pulled her from her hair and she was walking down the steps. But in a way that she couldn't see my face because I was ashamed and I was sorry about what had happened. And several feet from that step, several feet from that step I seen my vehicle and I took off to my vehicle.

According to the petitioner, trial counsel kept "badgering" and "coercing" him to plead guilty, and her statements that if he did not take the eight years he was "looking at forty something years" were "intimidat[ing]" to him and his wife and "caused [him] to take a plea bargain in which [he] did not want to take." The petitioner kept insisting to trial counsel that he had not decided to plead but was "waiting to hear from the Lord," that "the Lord is going to give me a sign for me to, if he wants me to take this plea, and I know that he didn't want me to take the plea but I had no choice but to take the plea . . . ." Trial counsel, however, showed "no instinct that she wanted to go to trial" and told the petitioner if he went to trial and lost, he would be "looking at . . . forty something years." The petitioner admitted that trial counsel told him the eight years would be at 100%, but his response to her was "what do you mean a hundred percent . . . I didn't do the crime." However, she "didn't want to hear" what the petitioner had to say even though he told her he was "taking medication for antidepressant, schizophrenia." Trial counsel always "was in a rush to get back to Nashville" and "was in a rush to explain the eight years at a hundred percent." The petitioner explained his "state of mind" when he decided to accept the plea:

Q. Did she explain [the terms of the plea agreement] to you?

A. She explained that to me. She kept saying that, if you take this forty years -- if we go to trial, she says, but you're looking at forty years for the charge. Which, I'm scared. I mean, I'm afraid what's going on for me to -- for her to throw this at me to take this forty years for this charge. I had no . . . and in the state of mind that I was in, I had no choice.

On cross-examination, the petitioner admitted he assaulted the victim and destroyed personal property; however, he denied that he had committed a kidnapping. He acknowledged he signed the plea agreement and initialed it at the places where it indicated eight years at 100%; however, he did so only because he "had no choice" because he was "looking at the charge for forty years." The petitioner said that when the trial court questioned him at his guilty plea hearing, he "was under influence of medication and plus the coercion and intimidation that [trial counsel] was doing" and he "didn't have a good state of mind." Although he responded in the affirmative at the guilty plea

-5-

hearing when the trial court asked him about his plea and sentence, the petitioner stated that he "didn't understand" the plea because he "was not at the right state of mind." He said he was "no kidnapper or no rapist or any other of that craziness."

The post-conviction court reviewed the guilty plea transcript and determined that "[t]he plea is good" and that the court did not "see a thing in the world wrong with the plea." In addition, the court also addressed the petitioner's proof at the evidentiary hearing and concluded that he had failed to carry his burden of proof on either of his claims. The court subsequently entered an order on November 16, 2004, denying and dismissing the petition "[f]or reasons stated from the Bench on the record."

## ANALYSIS

### I. Post-Conviction Standard of Review

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

### II. Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

-6-

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. When a petitioner's ineffective assistance claim is made in the context of a conviction stemming from a guilty plea, he must prove a reasonable probability that were it not for deficiencies in his counsel's performance, he would not have pled guilty but instead would have insisted on going to trial. See Shazel v. State, 966 S.W.2d 414, 416 (Tenn. 1998). "In cases involving a guilty plea or plea of *nolo contendere*, the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

Because both prongs of the test must be satisfied, a failure to show either deficient performance or resulting prejudice results in a failure to establish the claim. See Henley, 960 S.W.2d at 580. For this reason, courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner argues that counsel was defective for failing to investigate the case, failing to locate any witnesses on the petitioner's behalf, failing to take photographs of the crime scene, failing to determine whether "there was a factual basis to support said plea" before allowing the petitioner to plead guilty, failing to allow the petitioner to tell his version of the events at trial, and failing to inform the petitioner that the facts of the case were insufficient to establish the crime of aggravated kidnapping.

The record in this case, however, fully supports the post-conviction court's finding that the petitioner received effective assistance of counsel. Trial counsel's testimony, which was obviously accredited by the post-conviction court, established that she was quite familiar with the facts as well as the strengths and weaknesses of the State's case against the petitioner, and she made every effort to explain such to the petitioner:

> [H]e and I had had lengthy conversations talking about each of the particular charges, and what the evidence was, and we discussed, for example, on the attempted rape. I gave him my analysis that, for example, that I didn't think that the evidence that the State had was very strong on that particular charge. However, that they still could argue to a jury that what else would have been the purpose for dragging a woman by

her hair outside and then only abandoning that effort once a truck was coming by and taillights were shining. And then the perpetrator ran. And I told him I said, well, you know, that coupled with the statements that he made, that the victim said in terms of . . . [c]ome on bitch, come on bitch. That although there was no touching of the victim, nothing necessarily sexual. You know, we even had discussions about how well a jury might see that as either general hatred toward woman or hatred toward this woman. The phone calls that the victim had claimed he had made and left on her answering machine saying that she was a very nice lady, that he would like to take her out to dinner, and how she didn't respond to that. That could have shown - - that the State could have argued that that would have expressed perhaps a sexual interest in her and maybe that an argument could have been made that he was then spurned by her because she didn't return his calls. And I was explaining to him that an argument could be made that a jury might buy but I thought in general that it wasn't particularly strong evidence.

But then we talked about with the aggravated burglary charge how that was, as I explained to him, I felt it was a slam dunk case against him. On the aggravated kidnapping we discussed the issues in State v. Anthony [817 S.W.2d 299 (Tenn. 1991)] where there could be a possible merger of the aggravated burglary and the aggravated kidnapping where maybe the State would have to elect between one or the other. But that there are factors set forth in State v. Anthony and other case law that the State might be able to show that both could stand. And we talked about the issues of consecutive sentences between the charges that he was charged with and once he picked up the aggravated burglary charges in Davidson County we discussed how since he was on bond, that by law, if he was convicted in that case it was -- is as slam dunk as you get. He was found coming outside of the home of the alleged victim and a bag with, I believe, jewelry and things was found in the house. So, you know, there was a very strong level of certainty that there would have been some sort of conviction in that case. So we discussed, you know, that he needed to factor into and perhaps hedge his bet and try to keep the sentence here in Wilson County just as low as possible. And since we were able to get the bottom of the sentencing range on a Range One sentence whereas he was actually Range Two, I thought we did that.

. . . .

Well, on the day of the plea we did have a lot of conversations back and forth, because I think I recall after he mentioned it today I probably wouldn't have recalled it had he not jogged my memory, but I do think he talked about wanting to wait to hear from God about what to do. And he's only -- and this may just be his perception but when he was talking about being rushed to make a decision, that's only partly true. There was a degree of rushing not because I was trying to hurry to get back to Nashville, this was all I had scheduled for that day because when one is especially out of town, you know, you just never know when you're going to be done. So it

-8-

wasn't a matter of me trying to get out, but there was the issue of we had to make a decision, and we couldn't just keep, you know, waiting indefinitely because that day was the final date where we had to either decide to take a plea or set it for trial.

Every time when I was talking with [the petitioner] I always gave him the option of having a trial, and I was more than willing to go forward with a trial. Even once he did finally make the decision to enter a guilty plea, I asked him, okay are you comfortable with this? Because I knew there were issues, what [the petitioner] was saying on the stand just now about almost wanting to do sort of a suicide by cop scenario, he had told me that as well. During our discussions there was -- he was always very candid in our discussions, admitting many things against his interest. But in our discussions he never said anything about wanting to rape her. So, you know, that factored into our discussions in terms of what to do.

He and I spoke at length about how the State's case, in my opinion, was very iffy on an attempted rape. But as I mentioned earlier there's still the possibility that it could have stuck. You never no [sic] with a jury. And my concern was that a jury would have been left wondering why in the world was he taking her out, you know, by the hair, if he wanted to escape he could have just ran. And we talked about that scenario.

We also, more importantly on the aggravated kidnapping, we spoke, I don't think I had ever given him a copy of the State v. Anthony case and all the other case law that I had done research on springing from the State v. Anthony case. But we had discussed it. And I told him how, well, you know, that's even iffy. It's possible that the State might have to elect between the offenses and if the State does elect they might elect to go with the Ag kidnapping since that would carry one hundred percent and it would be a higher sentence. But I told him, I said there were many balls up in the air in terms of whether that could stick.

My biggest concern was that on the aggravated kidnapping charge, he and I had discussed at length and these are from my notes that I had taken down before I was discussing this with him how on the issue of aggravated kidnapping how it would need to be false imprison plus I did facilitation -- to facilitate the commission of a felony thereafter. I said, well, you know, the State's probably going to say that the felony thereafter would have been the rape that they felt you were attempting. I said, that might be a little iffy, but the State could also possibly allege that maybe there would have been an aggravated assault, or who knows.

So he and I discussed about how that might not have been perfectly solid but it could have legs. We talked about how with the other subsection about with the intent to inflict serious bodily injury on, or to terrorize the victim.

We discussed how the issue of clumps from the hair when he was pulling her by the hair, in discovery it talked about how clumps of her hair had come out. I said, well, you know that could be simple assault which would be a misdemeanor, which would be bodily injury, or it could be characterized as serious bodily injury.

And we even talked about how in discovery there was a statement from [the victim] where she said she didn't need medical attention, she was okay but just shaken up. So there were conflicts in terms of serious bodily injury. He and I talked about that, but I also told him, I said, well, there's also the part about serious bodily injury or to terrorize. I said, it wouldn't be hard for a jury to think that she was in terror. She was shrieking, neighbors heard her, her children were there, she would have been terrorized for herself and for what her children were seeing and if anything was going to happen. So that was one of the things that had the most legs in terms of where an aggravated kidnapping could have stuck.

But then one of the things, and I think [the petitioner] is just mistaken on, he kept saying that it was either take the deal or he could get forty years on that charge. What I had explained to him is that it is possible for him to get, well one day shy of forty-one years in terms of his maximum exposure on the entire case. Not just on the aggravated kidnapping. But, just if he testified he even admitted that I always gave him the option of taking the case to trial and that he was motivated by a sense of fear in terms of not wanting to risk the maximum exposure. In fact, my recommendations to him was that, especially in light of the case in Nashville and there was the possibility of a federal case that was looming overhead. So he had a lot of possibilities for consecutive sentencing, not to mention consecutive sentencing amongst the charges in this case. And although, you know, I felt that the Ag kidnapping wasn't the case that the State had the strongest case on there was still the potential for him to be convicted on all of them, or some of them, and with him being a Range Two offender even getting convicted on one could have easily gotten him this same sentence or a lot more. So, what we were trying to do was to hedge our bet and it was a conscious decision. We had very lengthy discussions.

My discussions with his wife. I never -- I can't recall ever just my initiating a call. Any time I called her was to return a phone call that she had made. And since he had given me lead to talk to her, his wife is naturally concerned about how much time he could get and we talked about it. It's unfortunate if she would have been spooked by the potential exposure, anybody would have been. It was there, it was a possibility. But, that, you know, the scariness of that does not translate into coercion.

Not only did trial counsel testify that she discussed in detail with the petitioner the risks of going to trial versus pleading guilty, she also recalled that she sought mental competency evaluations while formulating possible defense strategies. She met with the petitioner several times, reviewed

discovery with him, and advised him that his eight-year sentence would be as a Range I offender, to be served at 100%. Trial counsel stated that the petitioner was very intelligent and did not indicate at any point that he did not understand the terms of the plea. She also spoke with the petitioner's wife at length during the course of her representation. She was not aware that the petitioner was dissatisfied with her representation until she received a copy of the post-conviction petition in the mail. Additionally, the petitioner failed to present any witnesses at the evidentiary hearing who would have been helpful at trial and failed to show how photographs of the crime scene would have helped in his defense. We also agree with the State that the petitioner's version of events, as recited at the evidentiary hearing, certainly seemed more inculpatory than exculpatory. In sum, there is no evidence that counsel was deficient in her representation or that the petitioner would not have pled guilty were it not for counsel's alleged deficiencies. We conclude, therefore, that the petitioner is not entitled to post-conviction relief on the basis of his claim of ineffective assistance of counsel.

### III. Voluntariness of Guilty Plea

As a corollary to his first claim, the petitioner also contends his guilty plea was not knowingly, voluntarily, or intelligently entered, asserting that he was not "on notice that he was pleading guilty to a charge which had no factual basis" and he "relied on counsel's advice in entering his guilty plea and entered the plea based on the erroneous advice of counsel, which was not supported by the facts." The State argues that the evidence supports the post-conviction court's finding that the petitioner freely, voluntarily, and knowingly entered his plea. We agree with the State.

When analyzing a guilty plea, we look to the federal standard announced in Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), and the state standard set out in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. 395 U.S. at 242, 89 S. Ct. at 1711. Similarly, our Tennessee Supreme Court in Mackey required an affirmative showing of a voluntary and knowledgeable guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. Pettus, 986 S.W.2d at 542. A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he fully understands the plea and its consequences. Pettus, 986 S.W.2d at 542; Blankenship, 858 S.W.2d at 904.

Since the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. Blankenship, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and (5)

the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. Id. at 904-05.

The record in this case shows that the post-conviction court considered the appropriate factors in determining whether the petitioner's plea was knowing, intelligent, and voluntary. Among other things, the post-conviction court noted the petitioner had represented himself very well at the post-conviction hearing and responded appropriately to the trial court's questions at the guilty plea hearing. At the conclusion of the post-conviction hearing, the court stated, in pertinent part:

Well, I've listened today, and I believe that [the petitioner] is a passionate man, I think he's trying to tell the truth as he understands the truth to be.

Some things happened during this case that I didn't like leading up to it, and his complaint about counsel not coming to court on time. In fact I think I put a show cause down at one time or another about that. Which is not a good thing to have to do.

But I have watched this testimony come in and distinctly asked the questions that I know need to be asked when taking the plea of guilty to make sure that the party who is pleading guilty, in all cases, understands the plea. And there's not much way a judge or anyone can go behind to get to the fears and anguish that's going through a defendant's mind, because there is fear and anguish going through every one's [sic] mind who is put in the same position you were put in. That's just part of the system.

There are a lot of unknowns at the time you're making a decision to enter a plea of guilty to a charge. Those unknowns are what causes people to plead guilty in most instances. If it was all known exactly what is going to happen there would not be any reason to go through all of this. We would go to what we already knew and put that down, but we can't do that, we don't know. I don't know what would have happened if you had a trial. I know that in your mind you're feelings are that you didn't go there to do a rape. You don't believe you had an intent, and although the evidence may tend to show that, and that's what gets the unknowns involved. You're [sic] feeling was that you didn't have the intent to do that. But then you have to look at the intent of the person on the other side, what they believe the intent was, and a jury has to look at the facts and decide what they believe the intent was. So there are a lot of unknowns. I don't think we could have gone over and explained to you the hundred percent rule on certain type felonies any better than we did, because you were looking at a hundred percent. And there's no way that I could change that, no way any of us could change that. That's part of it.

But, I think you're very passionate about what you believe, and I think you presented yourself well here today. But there's not anything that I can find that

-12-

would cause this to be tried again, based upon all the testimony in the case. The facts of what happened, how the plea came about appear to be in the rein [sic] of acceptable legal practice. And, of course, you wish today that you had made a different decision back then, I know you do. And the Court kind of wishes you had, that way we wouldn't be here on this. But we have to have a finality to things, and the finality is that if you get dissatisfied later on you can come back and change it. Our system doesn't work that way, it can't work that what [sic]. I know you have a wife you love very much, that's very apparent from your speaking, and the Court believes that you do.

. . . .

. . . But I'm sorry, I'm going to have to leave you right where you are . . . . I don't see any constitutional basis that would back up your motion.

The Court is going to overrule your motion, and deny it.

The record fully supports the findings and conclusions of the post-conviction court. The transcript of the petitioner's guilty plea hearing reflects that the trial court carefully informed the petitioner at great length of the rights he was waiving by pleading guilty as well as the nature of the original charges against him:

[THE STATE]: The agreement -- he's charged in a multicount indictment, Your Honor, of aggravated kidnapping, aggravated burglary, attempted rape, simple possession of a Schedule VI. He's pleading guilty to aggravated kidnapping, a Class B felony, as charged, taking an eight year sentence as a standard -- as a Range One offender, but it's 100 percent. It's 100 percent offense to serve. And no fine. So it's going to be eight years at 100 percent to serve. And Count 2, 3 and 4 would be nolle prossed by the State. . . .

. . . .

THE COURT: [The petitioner], you heard the announcement of the district attorney. You heard the announcement also of the victim, what the victim thought in this case. And you're wanting to plead guilty today and take the recommendation of the district attorney; is that right?

[THE PETITIONER]: Yes, sir.

THE COURT: You agree to that sentence?

[THE PETITIONER]: Yes, sir.

-13-

THE COURT: Now, this request for acceptance of plea of guilty petition to waive trial by a jury to waive an appeal, did you read this –

[THE PETITIONER]: Yes, sir.

THE COURT:  -- document?  Did you sign it?

[THE PETITIONER]: Yes, sir.

THE COURT: You think you understand it?

[THE PETITIONER]: Yes.

THE COURT: When they say "standard offender" then they say "100 percent," those don't really go together much anymore.  You're going to be not a standard 30 percent offender like some of the rules for some crimes.  You're going, for the type of crime it is, it's 100 percent you have to serve.  And you may or may not get credits down there for up to 15 percent if you're a perfect inmate.

[THE PETITIONER]: Yes, sir.

THE COURT: Now, you were charged with aggravated kidnapping, that carries an eight to 12 years within the range you'd have to be.  Aggravated burglary carries three to six years within the range you would be qualified to be.  Attempted rape carries three to six years -- I'm trying to see where it's written here.  There it is -- three to six years.  Simple possession carries up to 11 months 29 days. . . .

. . . .

THE COURT: All right, sir.  You understand that's what the State would attempt to prove if you went to court on these charges and had a trial?

[THE PETITIONER]: Yes, sir.

THE COURT: You're eliminating three of the charges by pleading guilty to the most severe charge.

[THE PETITIONER]: Yes, sir.

THE COURT: And -- you got a prior record or anything?

[THE PETITIONER]: Yes, sir.

-14-

THE COURT: What kind of prior record do you have?

[THE PETITIONER]: Burglary charge.

THE COURT: How old is it?

[THE STATE]: It's pending in Metro, I believe.

THE COURT: Pending in Metro? So he hasn't been convicted of anything prior to that?

[TRIAL COUNSEL]: You mean just prior convictions in general?

THE COURT: Prior convictions in general.

[TRIAL COUNSEL]: Yes, he did have. Two.

THE COURT: What are those?

[THE PETITIONER]: It was a burglary charge and (inaudible).

THE COURT: You weren't on probation at the time of parole?

[THE PETITIONER]: No, sir.

THE COURT: Now, you don't have to do this. You're entitled to a trial. All these charges could be brought here in this court, let a jury sit here and make a decision whether or not you're guilty or not guilty. So you're telling me today that you freely voluntarily sign this request for acceptance plea of guilty, petition to waive trial by a jury, waive an appeal?

[THE PETITIONER]: Yes, sir.

THE COURT: And ask this Court to do this?

[THE PETITIONER]: Yes, sir.

THE COURT: You don't have to do it, as I said. You have a right to plead not guilty, right to confront and cross-examine each and every witness that appears against you at trial. You would have a right at the trial to bring in your own witnesses through subpoenas if you chose a trial. No one could make you testify at trial. It would be your decision if you chose to testify, because no one can make you

testify where you could incriminate yourself. But you say you want to voluntarily waive your right to a constitutional trial and plead guilty? I'm sorry?

[THE PETITIONER]: Yes, sir.

THE COURT: Well, you're doing it voluntarily and knowingly, and the Court's going to approve the sentence of eight years at 100 percent offender in the state penitentiary for aggravated kidnapping.

We agree with the post-conviction court that the record demonstrates the petitioner entered his plea knowingly and voluntarily after being fully informed of his rights and the sentencing aspects of his plea, and with full knowledge of the risk of being convicted at trial and receiving a greater sentence. The entry of a guilty plea to avoid the risk of greater punishment does not make a plea involuntary. Hicks, 983 S.W.2d at 248. The petitioner testified that trial counsel communicated to him the terms of the plea agreement, but he was "waiting to hear from the Lord" before he made a final decision to accept the plea. We find nothing in the evidence that shows that this plea was improperly coerced or improperly entered and, therefore, hold that the post-conviction court did not err in denying the petitioner's post-conviction petition on this issue.

## CONCLUSION

We conclude that the petitioner failed to meet his burden of demonstrating by clear and convincing evidence that he was denied the effective assistance of trial counsel. We further conclude that the petitioner's guilty plea was knowing, intelligent, and voluntary. Accordingly, we affirm the denial of post-conviction relief.

_____

ALAN E. GLENN, JUDGE